STATE, Respondent, *v.* WHITWORTH, Appellant.

(No. 1,636.)

(Submitted October 3, 1901.　Decided November 25, 1901.)

*Criminal Law—Homicide—Prosecution—Assistant Counsel—County Attorney—Evidence—Threats—Requested Instructions.*

1.　Political Code, Secs. 4318, 4319, providing that county officers, except county commissioners and justices of the peace, may appoint necessary deputies for the prompt discharge of the duties of the offices, have no appli-

cation to the appointment by the court of counsel to assist a county attorney in prosecuting persons charged with crime.

2. Where a criminal cause is removed to another county, the attorney of the county to which the cause is removed must prosecute it.

3. The statutes declaring who shall be charged with the duty of prosecuting persons charged with crime does not exclude power in the court to appoint counsel from members of the bar to assist in the prosecution.

4. In trial for murder it appeared that deceased had threatened to kill "any Missourian in the employ of V. who undertook to move hay on High Tower ranch," and had made other threats against Missourians so employed, and that defendant was a Missourian, and employed on said ranch; but the evidence also showed that at the time defendant struck the fatal blow he was not in immediate danger, but that he went up to deceased, who was standing in a threatening attitude over a friend of defendant, who was not shown to be a Missourian, and who was on top of, and was fighting with, a friend of the deceased. *Held,* that it was not error to refuse to instruct that the jury should take such threats into consideration in determining the nature of the attack made on defendant's friend, and what was the purpose of deceased and his friend in making such attack.

5. A court should not be captious or hypercritical and refuse an important requested instruction solely on the ground of verbal inaccuracy; still it is not the duty of the court to undertake, in all cases, the labor necessary to prepare and rewrite defective requested instructions which if correctly stated might well be given in the charge.

MR. JUSTICE PIGOTT dissenting in part.

*Appeal from District Court, Broadwater County; F. K. Armstrong, Judge.*

WILLIAM WHITWORTH was convicted of manslaughter, and appeals. Affirmed.

*Mr. William Wallace, Jr.,* for Appellant.

## I.

What county attorney prosecutes in Broadwater county? Section 1978, Penal Code, on removal, says the case must proceed to trial and judgment as if begun there. Laws of 1899 (amending Section 4450 Political Code) say each county attorney must attend the district court, conduct all proceedings at *all times* and *at all places within his county.* The italicised language represents one of the features accomplished by the amendment as shown by an examination of the original section. Under Section 1981, if removed as to part of defendants, different county attorneys would try. Where as here the duties

of the officer are limited to his county or district, so are his rights; and where a case is transferred out of his county he does not follow it. (*U. S.* v. *Winston,* 170 U. S. 522, 42 Co-Op. Ed. 1131.) That a different practice has prevailed unchallenged can cut no figure, when the question is raised and the law plain. (*Modoc Co.* v. *Spencer,* 103 Cal. 498, 37 Pac. 483, 484.)

## II.

May the court permit a private attorney to represent the state in prosecuting a criminal charge? The following authorities hold that this may not be done: *Bunnell* v. *State,* 71 Wis. 444; *Modoc Co.* v. *Spencer,* 103 Cal. 498, 37 Pac. 484; *People* v. *Hurst,* 41 Mich. 328, 1 N. W. 1027; *People* v. *Hendryx,* 58 Mich. 319; *Meister* v. *People,* 31 Mich. 99; *Commonwealth* v. *Knapp,* 10 Pickering 477, 482; *Commonwealth* v. *Williams,* 2 Cushing 582, 584; *Commonwealth* v. *Gibbs et al.,* 4 Gray 146; *Commonwealth* v. *King,* 8 Gray 501. Special statutes in some states authorize employment of private special counsel —in Iowa, by board of county commissioners (*Hopkins* v. *Clayton Co.,* 32 Iowa 15); in Kentucky, by the attorney general (*Hendrick* v. *Posey et al.,* 45 S. W. 525); in Nebraska, by the district attorney (*Sands* v. *Frost Co.,* 42 Neb. 837). The same in Pennsylvania (*Com.* v. *Shire,* 178 Pa. St. 409).

By Subdivision 7 of Section 460 of the Political Code, the attorney general is required to assist the county attorney when required by the public service or when directed by the governor. And Sections 4318 and 4319, Political Code, provide for the appointment by the county attorney, himself, in writing, of an assistant, subject to allowance by the board of county commissioners. It would seem clear that our statutes are framed on the theory that public officers alone shall prosecute for crime and that the county attorney of the trial county shall act in person, or by authorized assistant, duly appointed; and that emergencies are provided for by authorizing the incoming

of the attorney general as needed. It is not intended to deny the inherent power of a court, finding itself without a prose-cuting officer, to supply one temporarily, but no such question as that is here presented, because the county attorney was in court, had been conducting other business,—only said he was not feeling well, in his own affidavit, and actually remained and prosecuted the case.

As to the instructions, the following principles are laid down; (a) "It is the *right* of the parties to have the jury instructed on the law applicable to the case *clearly and pointedly, so as to leave no reasonable ground for misapprehension or mistake.* And it is the *duty* of the judge when requested to give in the charge *any requested instruction* which is *correct,* as a proposition of law, and applicable to the issues." (*People* v. *Jacks,* 42 N. W. 1135; *Parker et al.* v. *State,* 35 N. E. 1105, 1108; *People* v. *Taylor,* 36 Cal. 256, 266; 11 Enc. Pl. & Pr. p. 213, 214 and cases.) As especially applicable to this kind of case see also: *People* v. *Payne,* 8 Cal. 343, 344; *Townsend* v. *Briggs,* 34 Pac. 117. The court must correct inaccuracies in offered instructions and charge on the propositions embodied. (*Connors* v. *State,* 2 N. W. 1143.) (b) The charge as given must cover *every* phase of the evidence. (11 Enc. Pl. & Pr. 191, 193, and cases; *Perry* v. *State,* 44 Tex. 473, referred to; *Martin* v. *The State,* 47 Ala. 564.) (c) Offered instructions 3, 4 and 7 deal with phases of question of occupancy and immateriality of title not covered by the charge. Each correctly states the law. On immateriality of title: *Sims* v. *State,* 44 S. W. 522; *People* v. *Payne,* 8 Cal. 341. On occupancy and forcible tearing down: *People* v. *Payne,* 8 Cal. 341, 343, 344; *The People* v. *Hornshell,* 10 Cal. 83, 88; *Sims* v. *State,* 44 S. W. 526. Particularly as to offered instruction No. 4: *Butte & B. Con. Mng. Co.* v. *M. O. P. Co.,* 60 Pac. (Mont.) 1043. (d) Offered instructions Nos. 10 and 17 deal with above and also declare whose *duty* it was to retreat and whose *right* it was to *stand their ground,* under supposed facts within the evidence in the case, a matter not directly charged on elsewhere, and

which was so vital to defendant that there should have been no chance left for any misapprehension by the jury. They correctly state the law in this regard. (*Wallace* v. *U. S.,* 162 U. S. 474; *Townsend* v. *Briggs,* 34 Pac. 117.) They must form a part of the charge. (*State* v. *Rolla,* 55 Pac. 524; *Connors* v. *State,* 2 N. W. 1143.) The statute itself has recognized the importance of advising the jury whose duty it is to retreat and whose right it is to stand, in other words, who may lawfully make resistance, and who must yield and give way because in wrong. (Sections 1411 and 1412 of the Penal Code.)

The defendant was entitled to be where he was. The deceased and his companion were engaged in a willful and forcible trespass upon the property of appellant's employer which had been put expressly in his charge, and it was vitally important to him to enable the jury to clearly judge his case that there should be no uncertainty in their minds as to who had the right to stand their ground and resist and whose duty it was to yield, fall back and give way, and the court did not in this case make this matter clear and certain to the jury, as the offered instructions 10 and 17 would have done.

(e) Offered instruction No. 23 deals with the law as to deceased's threats, which was wholly omitted from the charge of the court.

*Mr. James Donovan, Attorney General,* for the State.

MR. JUSTICE MILBURN delivered the opinion of the court.

This case is before the court upon appeal from the judgment and the order denying a motion for a new trial.

The defendant was charged with the crime of murder in the first degree, alleged to have been committed in Meagher county. A change of venue was had to Broadwater county. The accused was convicted of the crime of manslaughter. The county attorney of Broadwater county prosecuted the action, and over the

objection of the appellant the county attorney of Meagher county and Max Waterman, Esq., attorney at law, assisted in the prosecution as of counsel for the state.

The evidence in the case is as follows: The deceased, William Cameron, was mortally wounded by the defendant on January 17, 1900, on the ranch of one Van Camp, in Meagher county. Van Camp had occupied the premises peaceably and without dispute for over five years prior to August, 1900. The place was entirely inclosed by a fence built by Van Camp, who had also built, used and occupied thereon during the same period a cabin, a sheep corral, a sheep shed, a hay corral and a stable; cutting the hay each year and feeding it to his sheep and horses, and occupying the shed and corral with his sheep, at the usual seasons of the year. In August, 1899, while Van Camp was cutting hay, the deceased entered the fenced inclosure, and about seventy yards from the sheep corral pitched a tent, and proceeded, with the aid of one Johnson, to build a cabin. On October 5 the deceased and his father took down some poles from the Van Camp sheep corral and piled them in front of the sheep-shed door. When Van Camp's sheep came up, a "word row" occurred between deceased and defendant, in the course of which the defendant, using an opprobrious epithet, said, "If you persist, you will be put in a wooden box." At his dinner table, about November 20, defendant stated, "Deceased better be careful, or he might be carried off in a box." On January 15, 1900, at one Blethen's blacksmith shop, he said, "Cameron was liable to be out of there in a box." On the evening of January 16, defendant and one James Harvey, both employes then and there of Van Camp, were engaged in feeding the horses and milking the cows at the stables and corrals of Van Camp; the sheep feeding outside. At this time deceased and Johnson, having a few minutes previously fired a rifle shot from their cabin, started across to the Van Camp sheep corral, carrying an ax and a hatchet, for the purpose, as the deceased said, "of tearing it down." As soon as they arrived at the corral they began to chop posts and remove poles.

Defendant and Hanvey (the latter putting down an oat sack which he was carrying to feed the horses) urged Cameron and Johnson several times not to tear down the fence, deceased saying that he would tear it down; and he and Johnson continued their work of destruction. Hanvey picked up a corral stake about three feet long and two inches thick, and leaned on it. He and Johnson said each to the other that he could "lick him." Johnson "gave Hanvey the lie;" defendant saying, "Go for him, Hanvey." The two started for each other, Hanvey striking Johnson on the elbow with the club; and then, he dropping it, they clinched; Johnson backing a few steps and falling on his back, with Hanvey on top; the latter's face beginning to bleed as they fell. Cameron ran up to where they fell, and stood near their heads, in a "striking position." At this time the defendant, having picked up the club, went toward the other three, and, facing Cameron, struck him with the club on the side of the head, and, turning, also struck Johnson on the head with the club, as he lay upon the ground. One Hanvey testified that he was near the center of the corral, about fifty feet away from the defendant and the deceased, and was going toward them, and that he told the defendant not to strike the deceased or Johnson, who was then on the ground, under Hanvey. The defendant then started rapidly away across the corral; Hanvey getting up and following him, with his face and head bleeding freely. The defendant told Harvey that he struck the boys because he "could not bear to see them cutting Jim up so." Harvey saw a ridge about the size of a finger across the center of the first joints of Hanvey's fingers, which Hanvey said was caused by a knife of some kind. Cameron died the next day from fracture of the skull. At the time the lie passed between Hanvey and Johnson, the defendant picked up the ax and hatchet that deceased and Johnson had brought, and threw them out of the way, on top of the roof of the sheep shed.

In defense it was testified that all the defendant had said in the October 5 altercation was that he "could lick deceased on less ground than it would take to bury him on, or that he stood

on," and that during November, after the 7th until the 29th, defendant was not at the Van Camp home ranch, where testimony tended to show that he on November 20 made a threat against deceased. The defendant also denied all other threats. It also appears in evidence that deceased in August, 1897, had threatened to kill any "damn Missourian in the employ of Van Camp who undertook to move a load of hay on the "High Tower Ranch." The Van Camp ranch was known as the "High Tower Ranch." The defendant was from Missouri. He weighed about 115 pounds, and was about 5 feet and 5 inches high. Deceased was about 5 feet and 10 inches in height, and weighed about 140 or 150 pounds. Johnson was 5 feet and 9 inches high, and Hanvey 5 feet and 6 inches in height. This alleged threat was communicated to the defendant long before the day of the homicide. Johnson had ill will against Van Camp, and a few days before the day of the killing said that "if Van Camp did not quit keeping Missourians around him, he would lick the whole bunch of them, and take the first chance he got to do it." It was assumed that the rifle shot was fired by deceased in the direction of the defendant and Hanvey when near the High Tower cabin, because they heard the bullet whistle; Johnson testifying that deceased was shooting at some magpies that were around the house. It also appears in evidence that the defendant at the beginning of the quarrel picked up the hatchet, only throwing it on the shed, and that he and Hanvey repeatedly asked deceased and Johnson to quit tearing down the corral; saying that they wanted to put the sheep in it that night. Defendant and Hanvey testified that deceased and Johnson wore mittens, and gloves underneath, and had knife blades or some sharp instrument fastened to the back of their hands, underneath the mittens. The testimony for the defense was also to the effect that, as Johnson and Hanvey fell, Cameron, who was 34 feet away, grabbed the ax and started toward them. Defendant jumped up and wrenched the ax from his hand as he was raising it, and threw it on the shed. Deceased then grabbed the club or stake, and defendant quickly jerked that

from his hand, saying it must be a fair fight. Deceased then went to the heads of the men on the ground, and was "in the attitude of striking" at Hanvey from the side; Johnson striking from below. Defendant, Hanvey and Harvey testified that Hanvey was bleeding freely at the time defendant went over to the spot where deceased was, and struck Johnson and deceased each a blow with the club. It was also shown in the testimony for the defense that there were four cuts about the head of Hanvey, evidently made by some sharp instrument, still bleeding after a trip of 20 miles to another Van Camp ranch,—the bandages around the head being saturated with blood,—and that the wounds on the head bled a great deal during the night. Dr. Kumpe, a practicing physician, testified that he examined the head of Hanvey eight days after the killing, and could only find two small wounds, mere scratches, neither of which cut through the skin, and that, in his opinion, they were not made with a knife; that they looked more like pin scratches.

The first and second specifications are: (1) "The court erred in permitting the county attorney of Meagher county to prosecute the action, against the objection of appellant;" and (2) "the court erred in permitting Attorney Waterman to prosecute on behalf of the state in said action, against the objection of the appellant." It appears from the record that the county attorney of Broadwater county appeared in open court and asked that the county attorney of Meagher county and Max Waterman, Esq., be appointed to assist him in the trial of the cause, at the same time filing his affidavit setting forth that he (the county attorney of Broadwater county) was then and there physically unable to assume the entire burden of the prosecution; and the court, finding that the attorney general was absent from the county of Broadwater, and that the cause was then ready for trial, granted the motion of the said county attorney of Broadwater county, and said county attorney of Meagher county and the said Max Waterman, Esq., were then appointed by the court to assist in the prosecution of the cause,

and the objection of the defendant to the appearance of said parties as assistants to the county attorney of Broadwater county was then and there overruled. At the time of the making of the defendant's objection, his counsel made and filed the affidavit of said counsel to the effect that the county attorney of Broadwater county was not sufficiently ill to prevent him from giving the necessary attention to the case. It appears also that the said Waterman had been, before the defendant's preliminary examination in Meagher county, employed by the chairman of the board of county commissioners of Meagher county as special counsel to assist in prosecuting the charge, and had appeared for the state at said examination. It does not appear that any one of the three attorneys appearing for the state had received or been promised any compensation by any one whomsoever, except possibly such compensation as may be inferred as promised because of the employment of Mr. Waterman by the chairman of the board of county commissioners of Meagher county.

Defendant's counsel, in his argument, inquires: First, "What county attorney prosecutes in Broadwater county?" and, second, "May the court permit a private attorney to represent the state in prosecuting a criminal charge?"

In the light of the provisions of the Penal Code pertinent to the matter, it is apparent what answer must be given to the first question; that is to say, the county attorney of the county to which the cause is removed must prosecute, in the same manner as if the action had been begun in that county.

Counsel cites a large number of authorities tending to show that the court may not, over the objection of the defendant in a criminal action, permit a "private attorney" to represent the state in the prosecution. Examination of these authorities not only shows that they are not relevant to the question raised in the record at the time of the objection of the defendant to the appearance of the assistant attorneys, but at least one of them, *Commonwealth* v. *Knapp,* 10 Pick. 477, 20 Am. Dec. 534, even fails to support the proposition advocated by counsel for de-

fendant,—that the statute which declares who shall prosecute excludes the appointment of other attorneys by the court over the objection of the defendant; the case referred to being one wherein Mr. Webster was allowed to appear as counsel for the prosecution, over the objection of the defendant, upon the request of the prosecution. It is not necessary to pass in this opinion upon the question asked by the counsel, for it does not appear that the county attorney of Meagher county or Mr. Waterman, in any wise, in this case, was a "private attorney." A private attorney, as in the view of the courts whose opinions are cited by counsel, is an attorney employed by, and in the interest of, private persons, and not paid out of public funds. He is one who has a special interest in the securing of a conviction, being employed by private persons to prosecute. He is not one who, like a public prosecutor, is presumed to do his duty in an earnest and faithful manner, impartially, and with the sole purpose of presenting the whole truth to the court and jury, both as to law and facts. We do not find anything in the record to show that either of the two assistant counsel appointed by the court was employed in the interest of any private person.

It is contended by counsel in the argument that the county may have assistance only as provided in Sections 4318 and 4319 of the Political Code, except that the attorney general may appear, and that the court, when it finds itself "without a prosecuting officer," may "supply one temporarily." The two sections of the Political Code do not apply, as they are intended to provide for as many deputies in the office of any county officer, except a county commissioner and a justice of the peace, "as may be necessary for the faithful and prompt discharge of the duties of his office." It is obvious that these provisions do not pertain to the appointment by the court of such assistant counsel as it may think necessary in the prosecution of any particular criminal case, when, in the opinion of the court, owing to the physical weakness of the county attorney, assistance is needed.

We think the great weight of authority is in support of our

opinion that the court may legally, in its discretion, appoint counsel from the members of its bar to assist the prosecution, over the objection of the defendant, and that no error was made by the court in the present case in the matter.

In support of our position that the statute declaring who shall be charged with the duty of prosecuting persons charged with crime does not exclude the power of the court to appoint assistant counsel, we refer to the numerous citations in *Tull* v. *State ex rel. Glessner,* 99 Ind. 238, wherein the court says that: "The people do not surrender the right to employ just means of prosecuting criminals by choosing an officer and charging him with the special duty of prosecuting the pleas of the state. * * * The community does not avow that it will not employ counsel to assist him when the occasion demands." Numerous other authorities might be cited.

Defendant also complains that the court erred to his prejudice in refusing to give to the jury six certain instructions prayed for by him. Three of them, numbered 3, 4 and 7, deal with phases of a question of occupancy of the land upon which the killing occurred, and the immateriality of the title to the lands in the case; counsel claiming that the points were not covered by the charge. There was no testimony as to who held or pretended to hold title to the premises. The charge, as given, sufficiently covers the rights and privileges of the defendant in relation to the place where the homicide was committed.

As to requested instructions 10 and 17, defendant assigns error in their refusal, and says that they "declare whose *duty* it was to retreat, and whose *right* it was to stand their ground, under supposed facts within the evidence in the case,—a matter not directly charged on elsewhere, and which was so vital to defendant that there should have been no chance left for any misapprehension by the jury;" also that they touch upon the points raised in instructions numbered 3, 4 and 7. The charge states the right of the employes of the owner of the property (they being the defendant and one other) to defend the prop-

erty with necessary force. The reasonable and palpable deduction from the language of the charge is that the defendant and his co-employe, Hanvey, had the right to stand their ground on their employer's premises, and defend the property and themselves. The apparent conclusion to be drawn by any reasonable man from the charge is, besides, that the deceased had no right or business on the premises if the jury believed "the supposed facts within the evidence;" that is, the allegations of the defense that deceased and his comrade were trespassing upon the premises and engaged in destroying the property of the defendant's employer, in charge of which defendant was. Those parts of these two refused instructions which correctly state the law, and should be given in such a case as the one at bar, in our opinion, are sufficiently covered in the charge.

The defendant's refused instruction No. 23 is as follows: "As to threats by deceased, it is in evidence that a threat generally directed toward Missourians was made in connection with the High Tower ranch. If you find that the defendant belonged to the class mentioned, you should take into consideration such threat, if you find it proven, in determining what the nature of the attack, if any, made by the deceased upon Hanvey, was, and what the purpose of Johnson and deceased was in making such attack." The evidence shows that, at the time the defendant struck Cameron the fatal blow, he (defendant) was not in any immediate danger, but that, as indisputably appears in evidence, he went up to deceased and Johnson; Hanvey then being on top of Johnson, who was lying upon the ground; the deceased standing at the heads of the two, in an attitude threatening to Hanvey. It appears in evidence that the defendant was a Missourian. There is nothing tending to show that Hanvey was from Missouri. The alleged threat of deceased toward Missourians would not tend to indicate "the nature of the attack, if any, made by the deceased upon Hanvey," or "what the purpose of Johnson and deceased was in making such attack" upon Hanvey.

We note that counsel contends that "the court must correct

inaccuracies in offered instructions, and charge on the propositions embodied," and in support of this cites *Conners* v. *State,* 47 Wis. 523, 2 N. W. 1143. Examination of this case shows that it cites as authority *State* v. *Wilner,* 40 Wis. 304, wherein the court held that it could not sustain a judgment of conviction of a high crime; an important instruction having been refused solely on the ground of verbal inaccuracy. In that case the defendant asked for an instruction to the effect that "* * * insanity, once proved to exist, is presumed to exist until the presumption is overcome. * * *" The court thought the word "insanity" was too broad, and should have been qualified by the lower court, and the instruction given as thus modified. In other words, it was rightly held that a court should not be captious or hypercritical, and in this we agree; but it is not the duty of the court to undertake the labor and research necessary to prepare and write instructions, in all cases, where the counsel has in a proposed instruction, embodying, perhaps, argument, ambiguous language, misstatements of fact, or palpably incorrect statement of law, merely suggested certain principles which, if correctly stated, might well be given in the charge. We do not mean to say that the refused instructions in this case should be characterized as the above language might imply, but we merely wish to be understood as saying that the refused instructions could well be refused for sufficient reasons other than that they were verbally inaccurate.

The instructions given were favorable to the defendant, and were clear enough to be understood, we think, by a juror of average intelligence, and, further, we think they covered sufficiently such appropriate points as were raised in the refused instructions.

The judgment and the order denying the motion for a new trial are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY: I concur.

MR. JUSTICE PIGOTT: I concur with the majority of the court in holding that there was no error in permitting counsel to assist the county attorney; but I am not satisfied that the matters contained in prayers for instructions 10 and 17, touching the right of the defendant and Hanvey, under supposed facts which the evidence tended to establish, to stand their ground, were sufficiently covered by the charge, nor is it clear to me that refused instruction 23 was irrelevant. I am inclined, therefore, to think that there should be a reversal. This conclusion has been reached after much doubt and hesitancy, for I appreciate the force of the opinion upon these questions.