STATE, RESPONDENT, *v.* PARK, APPELLANT.

(No. 6,682.)

(Submitted June 23, 1930. Decided July 2, 1930.)

[289 Pac. 1037.]

*Mr. Ike E. O. Pace* and *Messrs. Duncan & Duncan,* for Appellant, submitted a brief; *Mr. M. M. Duncan* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, and *Mr. Frank E. Blair,* County Attorney of Madison County, submitted a brief; *Mr. Blair* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Harry Park, has appealed from a judgment of conviction of murder in the second degree on which he was sentenced to a term of twenty years and a day in the state penitentiary, and from an order denying him a new trial.

Harry Park, a Korean, shot and killed a fellow countryman, K. S. Paik, on October 29, 1929, in the presence of a third Korean, H. D. Hong, on a ranch near Whitehall, in Madison county. It is contended that he shot in self-defense and that the evidence most unfavorable to defendant, at most warranted a verdict of manslaughter.

Paik and Hong were partners in the operation of a ten-acre truck garden on a ranch owned by the Whitehall State Bank. They held a long term lease on the ten acres, but in 1929 made a poor showing and the bank had notified them that they would not be permitted to operate in 1930; the cashier had made tentative arrangements with Park to put in the garden in the spring, and had authorized him to commence plowing at that time. Up to the latter part of October, Park's

wife had been employed by Paik and Hong as cook, and the Parks lived in a three-room house on the ten-acre tract with Paik and Hong, but the partners then dispensed with Mrs. Park's services and the Parks moved to another house on the ranch.

All of the parties had been acquainted and on friendly terms for four or five years and their relations remained friendly throughout the financial troubles of the partners and during the negotiations for the change in the operation of the truck garden. Two or three days prior to October 29, Paik packed up all of his belongings and went to Butte to seek employment. On the morning of October 29, Park and Hong hauled a load of potatoes to Whitehall. They were absent from the ranch several hours, returning by way of Piedmont where Park purchased a half gallon, and Hong a pint, of moonshine whisky. While Park and Hong were absent, Paik returned to the ranch bringing with him a half gallon of moonshine whisky. On his arrival at the Park residence, Mrs. Park told her husband of Paik's return and that he had made threats to kill Park and his wife, according to Park's testimony. Mrs. Park warned defendant not to go down to the other place. Shortly thereafter Paik and Hong came to the Park house and were invited in to dinner; the men all drank together in a friendly companionship and the partners returned to their house. Some hours later defendant placed a pistol in his belt, buttoned his coat over it and went down to the ten-acre tract for the purpose of removing the harness from his horses kept in a barn near the house in which Paik and Hong lived.

Defendant testified that, as he passed the window of this house, he saw Paik seated and heard him threatening to kill someone that night, but, on seeing him, Paik called to him to come in and have a drink. He accepted the invitation, entering the dining-room; it was cold there and the others passed into the kitchen and invited defendant into that room, but he remained standing at the door. He testified that when he started to drink with them his wife appeared and attempted to dissuade him, repeating her warning that Paik wanted to

kill him. Testifying as to what thereafter transpired, defendant stated that Hong made some complaint of his having started plowing before the partners had their crops out of the ground, and, applying a vile epithet to him, accused him of causing trouble for them, whereupon Paik, whom the defendant described as "too drunk," drew a gun, but, he says, Hong took the gun and put it in his pocket. He then states: "Then I just takem gun—just I shootum; I don't want to kill either one, just make them scare." Defendant shot three times, the first high into the wall, the second struck Paik in the face, killing him instantly, the third struck the wall at a point two feet nine and three-fourths inches above the floor. Defendant's statement is that he was attempting to intimidate Hong who had a gun, although in his pocket, when Paik came forward after the first shot and sought to grab him; he then shot Paik. Defendant stated that at that time he forgot that Paik no longer had a gun. After shooting Paik, defendant told Hong, "If you move a hand I will kill you too," and backed out of the room and house.

Hong's testimony varied materially from that of the defendant. His statement is that Paik came up to the Park house just as he and Park arrived; everything was friendly; they all had dinner together and then he and Paik went to their house; Paik was not mad and made no threats that he heard; later Park came to the house and came in without invitation, accepted a drink offered by Paik, but remained standing by the back door through which he had entered. He testified that Park asked Paik whether he had made threats to kill him and told him that Mrs. Park had told him of the threats. Paik's reply, according to the witness, was: "Tellum nobody. What I you kill for?" Hong testified that he then went into the kitchen but heard Paik say, "Look at that in my pocket, even I ain't got any knife, no gun at all; what you tell me that kind of talking all the time?" He testified further that Paik had neither knife nor gun. After the above conversation Paik and Park entered the kitchen and, while Paik was standing by the table, without further conversation, Park

drew his gun and fired the first shot, whereupon the witness fainted. He "woke up" a moment later as Paik fell to the floor. Park threatened him and he begged for his life, finally escaping from the house. He met Mrs. Park who asked him what had happened and why her husband had kicked her; he told her of the killing and went for the sheriff. Later this witness discovered two bullet holes in the top of his cap and an effort was made to show that they were made by the bullet that entered the wall near the floor and that Hong was lying in a position during his faint to have permitted this to have happened.

1. Whether defendant's version of what took place at the time of the killing would warrant the verdict returned, or not, is immaterial; the jury was entitled to disbelieve his testimony and accept that of Hong, if it saw fit, and that evidence was amply sufficient to warrant the verdict and judgment. On this conflicting evidence the court was justified in instructing the jury on murder in the first degree and murder in the second degree, as well as manslaughter.

2. The defendant predicates error upon the action of the court in permitting one of the state's witnesses to answer over objection, the question: "Immediately after he [the defendant] informed you and the deputy that he had shot a man, he led you to the house you have described and to the dead body you describe?" Had this question been asked for the purpose of eliciting information, it would clearly have been objectionable as leading and suggestive, but the witness had already testified to the facts embodied in the question and it was in effect merely an observation by the county attorney in the course of questioning the witness on another matter. If the action of the court was error, it was nonprejudicial error, as the question elicited no new information.

3. While counsel for defendant was interrogating an expert witness on the effect of bullets fired into fabric, for the purpose of discrediting the theory that the defendant had shot at Hong, he asked the witness if he could account for the difference in the size of the two holes appearing in Hong's

cap, whereupon the judge declared from the bench, "The court knows of his own knowledge that those holes have been tampered with, from the time that got into the possession of the officers until now." Apparently the fact revealed was what counsel was seeking to establish, for, without a suggestion of exception to the conduct of the court, counsel replied, "I would like to show that from this expert witness," and then reframed his question to include the statement made by the court. The county attorney intervened to question the judge as to the source of his knowledge, and the judge offered to give his statement under oath, but counsel for defendant was satisfied to have it "incorporated in the record" as it was given. As no objection was made or exception taken to the remarks of the court, we will not consider the propriety of the court's action.

4. Error is predicated upon the exclusion of evidence that ▮ Mrs. Park had certain bad scratches on her arms the day after the shooting. Counsel assert that Mrs. Park had an "encounter" with Hong just after the shooting, and that her arms were not scratched prior thereto, and that this evidence would have tended to show animosity on the part of Paik and Hong to Park and Mrs. Park. Mrs. Park died a few days after the shooting; from what cause is not revealed.

This was not a case where an attempt was made to prove other acts of the defendant at the time of the killing, as a part of the *res gestae*, as in *State* v. *Schlaps*, 78 Mont. 560, 254 Pac. 858, or to show malice, as in *State* v. *Shafer*, 22 Mont. 17, 55 Pac. 526, and it certainly does not come within the rule announced in *State* v. *Felker*, 27 Mont. 451, 71 Pac. 668, relied upon by counsel for defendant. If the evidence was clear that Hong had made an assault on Mrs. Park, such assault might conceivably show animosity toward Park, but it must be remembered that, if an assault was committed, it was after the killing and while Hong was in a highly excited condition over the killing of his partner. However, the so-called . "encounter" on which counsel seeks to base his right to show the condition of the woman's arms thereafter, was, ac-

cording to the only witness who could testify concerning it (Hong) of the most friendly nature. His testimony was that, after the killing and his escape from the house and after Park also had departed from the scene of the killing he met Mrs. Park who was crying and she asked him what had happened and why her husband had just kicked her; that she took him by the arms and cried and he sought to console her. Under these circumstances, proof of scratches on Mrs. Park's arms was clearly irrelevant and immaterial. Even if the defense had been able to prove a simple assault made upon Mrs. Park after the killing and by the partner of the deceased, it is doubtful whether testimony concerning it would have been admissible; certainly such testimony would not come within the rule, relied upon, announced in *State* v. *Felker*, above.

5. The record discloses a mass of testimony regarding the ▮ transactions of Paik and Hong with the Whitehall bank, and, among other things, that the bank had been advancing them money for the care of their crop. In this condition of the record the defendant offered to prove by Park that Paik and Hong had padded an account to show that Park had worked for them twelve days, when in fact he had worked but six, and that Hong took the difference when the bill was paid. This offer was excluded. Counsel now assert that the evidence, if admitted, would have tended to show absence of malice on the part of Park, as he did not report the matter to the bank. At the time the offer was made counsel stated that its purpose was to show that Park was not trying to make trouble for the partners, as the state had sought to show he had. The tendered evidence was immaterial and properly excluded.

6. It is asserted that at one time the state was permitted ▮ to place upon the stand and examine, simultaneously, four witnesses. The situation which gave rise to this rather startling criticism of the court was that the defense expert on shooting having testified that he had visited the scene of the shooting with defense counsel some time before the trial and there had Hong sit against the wall in the position he said he was in at the time the third shot was fired, and that,

from the angle of the hole in the wall, indicating the line of the bullet's flight, it would have passed six inches above Hong's head and could not have pierced his cap, the state staged a demonstration in the courtroom on rebuttal. Garrison, a surveyor, who had theretofore testified to having made measurements at the scene of the shooting and made a map and plat of the premises, was recalled and, with his plat before him, was asked to demonstrate, if he could, whether it was at least possible that the holes in the cap were made by the second bullet in its flight. The witness then called Hong forward for the purpose of placing him in the position he occupied when he showed the witness and the sheriff how he was reclining at the time Paik was shot, and the sheriff came forward to assist in placing Hong in the correct position. A short colloquy took place between the witness and the sheriff as to the position of Hong's head. The witness asked the county attorney if he had a yard ruler, to which the latter replied, "I have not, no sir," and a fourth person present stated, "I can get you one in a moment."

Neither the county attorney nor the fourth person can be said to have been testifying. As remarked by the trial judge at the time, the sheriff was under oath; he had theretofore testified as to Hong's position at the time to which reference was made and could have later been called for further cross-examination, had the defense counsel desired. The whole conversation between the witness and the sheriff was but preliminary to testimony on the part of the witness as to the probability of the bullet which entered the wall, passing through Hong's cap. While the proceeding was irregular and is not approved, we find no reversible error in the action of the court with regard to it.

7. However, counsel contend that the court committed prejudicial error, during the proceeding last discussed, by entering into a colloquy with counsel, under the following circumstances: On objection to the statement made by the sheriff as to Hong's position, the court remarked: "The record shows that the witness Metzel [the sheriff] has made a state-

ment as to a position, and our record will disclose that fact, and will disclose the answers of the witness Metzel"; at which point it appears that one of defendant's attorneys spoke to his colleague and was overheard by the judge, who remarkèd, "Put error in? Going to get error you say?" Counsel replied that he was conversing with associate counsel; whereupon the court asked what he meant by the statement, to which counsel remarked, "I think your Honor is proceeding in a manner prejudicial to our case." The court: "I am willing to assume that responsibility; if it is the purpose of counsel to deliberately try the case for the purpose of getting error in it I don't think that is proper." Mr. Pace: "I am trying to keep error out." The court thereupon admonished the jury: "You should pay no attention to any comments between counsel and the court. Anything the court may say should not prejudice you in any form as to your conclusions upon this case." No exception was taken to the remarks of the court.

The court is charged with the duty of maintaining orderly conduct in the courtroom during the progress of a trial and was within its rights in inquiring into the matter when, during the course of a ruling, counsel interrupted by a remark which carried to the bench and, presumably, to the jury-box. We find nothing in the colloquy to warrant action by this court.

The remaining specifications of error concern the instructions.

8. The court instructed the jury, in accordance with the provisions of section 10505, Revised Codes 1921, that "the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason." Counsel for the defendant objected to the instruction on the ground that such is the case only when the "evidence is uncontradicted," and now assert that it conflicts with section 10672, Id., dealing with the weight and effect of evidence.

There is no merit in counsel's contention. "Preponderance of the evidence may be established by the testimony of a single witness against a greater number of witnesses who testify to the contrary, * * * for the jurors are the exclusive judges of the credibility of the witnesses (sec. 10672, Rev. Codes 1921)." (*Doane* v. *Marquisee*, 63 Mont. 166, 206 Pac. 426, 428.) And this rule applies with equal force in criminal cases wherein the state is required to prove the facts beyond a reasonable doubt, instead of by a preponderance of the evidence.

9. In the course of a long and correct instruction on the law ▮ of self-defense, the court instructed the jury that "it must appear that the deceased was the assailant or that the defendant had really and in good faith endeavored to decline further struggle before the fatal shot was fired." Counsel contend that the latter portion of the quotation "violates the rule of standing ground laid down in *State* v. *Merk*, 53 Mont. 454, 164 Pac. 655."

The quoted portion of the instruction is in the alternative; by other portions of the instruction the jury was fully advised of the rights of a person assailed. The second alternative applies where the defendant is, in the first instance, the aggressor, and the rule there declared is also recognized in the case of *State* v. *Merk*. The instruction is not open to the objection lodged against it.

10. Defendant predicates error upon the giving of two ▮ instructions on murder in the first degree, on the ground that they are repetitious and unduly emphasize first degree murder.

On settlement of the instructions counsel for the defendant expressly waived objection to the court's instructing the jury on murder in the first degree, and the evidence, as above pointed out, was sufficient to warrant such instruction.

We have carefully examined the instructions as a whole and find them the usual instructions in murder cases; the repetition and emphasis complained of merely consist in giving the statutory definition or usual general instructions on first

degree murder and then, later, applying the rules announced to the case on trial. In so doing the court did not commit reversible error.

11. Counsel objected to the giving of the following ▮ instruction: "You are instructed that proof of a motive for the commission of a crime is not indispensable to a conviction, if the commission of a crime is otherwise clearly established." The objections made on settlement of the instructions are that this instruction "expressly tells the jury that the state does not have to prove in any manner a motive on the part of the defendant to enable the jury to convict. And also under the law malice must be shown in some manner, * * * there can be no malice without motive."

It is true that there must be "malice" in order to constitute a homicide murder in the second degree (*State* v. *Fisher,* 23 Mont. 540, 59 Pac. 919), but the court fully instructed the jury on malice as a constituent element of murder and as to the manner in which it may be shown; even malice may be implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart" (sec. 10954, Rev. Codes 1921; *State* v. *Hollowell,* 79 Mont. 343, 256 Pac. 380), and the court so instructed the jury.

The instruction is in harmony with the declaration that "the finding of a motive is not indispensable, * * * it is often impossible to * * * assign any motive whatever to the act under consideration. Under such circumstances it is the duty of the jury to convict, notwithstanding the lack of proof tending to show motive, if the crime is otherwise clearly established." (*State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994, 996; *State* v. *Roberts,* 44 Mont. 243, 119 Pac. 566; *State* v. *Bennett,* 60 Mont. 355, 199 Pac. 276.) While the instruction may not be as complete as is desirable, taken in connection with the instructions on malice, it is sufficient.

12. Defendant specifies error on the court's refusal to give five offered instructions. A careful examination of the lengthy instructions given discloses that they cover every principle

contained in the offered instructions, and therefore no reversible error was committed in their rejection.

For the reasons stated, the judgment and order are affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.