THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
KEITH L. MORAN, DEFENDANT AND APPELLANT.
No. 10499
Submitted March 30,1963.  Decided August 7, 1963.
Rehearing Denied September 11, 1963.
384 P.2d 777.

424

Doepker & Hennessey, Maurice F. Hennessey, (argued), Butte, for appellant.

William J. Speare, County Atty., (argued), Billings, Jack D. Shanstrom, County Atty., (argued), Livingston, Arnold A. Berger, Deputy County Atty., Billings, Alfred Coate, Asst. Atty. Gen., (argued), Helena, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment entered upon a jury verdict finding defendant guilty of the crime of burglary in the district court of Yellowstone County. The cause had been transferred to that county from Park County upon the granting of a motion for change of venue.

We will give a brief summary of the fact situation as dis-

closed by the record and amplify when discussing the errors specified.

The defendant, Keith L. Moran, was Chief of Police at Livingston, Montana, at the time the offense herein charged was committed. The defendant, as a police officer had attended special police training schools relative to the duties of his office and the criminal laws of this state.

Defendant together with Billy G. Smith, a former Livingston police officer, and Thomas Charles Adams, then a Livingston police officer, planned to burglarize the Downer Lumber Company. On the evening of January 15, 1961, these three individuals met at Birkland's sawmill, got into Smith's pickup and drove to the Downer Lumber Company plant. The undisputed testimony is that it was between 6:30 and 7:00 P.M., "it was after dark". While the defendant stood outside of the Downer Lumber Company office building, Smith and Adams entered the building and carried office equipment outside and placed it on the ground. Then all three carried the equipment to Smith's pickup, loaded the pickup, and drove to the alley behind the defendant's house. Some of the equipment was then unloaded on defendant's back porch and the rest of it was taken home by Smith.

On the morning of February 15, 1961, the county attorney and the sheriff went to the defendant's home to talk to him. The sheriff was advised by defendant's wife that defendant was sleeping but she agreed to wake him. The sheriff returned to his car and waited for some time. Later he returned to the house, and as defendant was up, the sheriff advised him of the purpose of the visit. He told him that information had been received by the county attorney which tended to implicate defendant in a crime. The sheriff requested defendant's permission to search his car, garage and house. Defendant was told that if a search warrant was obtained the issuance of it would be a matter of public record. He was given the affidavit which had been prepared as a basis for issuance of a search warrant

to read. After considerable discussion defendant consented to the search of his property without a search warrant. Defendant's consent was evidenced by these words "Let's go look." During the course of the search a Clary adding machine, a Marchant calculator, a Marchant adding machine, and a Verifax Signet Copier, shown to be the property of the Downer Lumber Company were found in the defendant's home.

The district court called a Grand Jury and the defendant was indicted on several counts. Later the defendant was charged by information with the crime of burglary. Defendant was tried upon the latter information and convicted of the crime of burglary in the first degree.

Upon this appeal defendant contends error on the part of the district court in the following respects:

1. In denying the motion to quash the information filed in Park County, Montana.

2. In failing to sustain defendant's demurrer to the amended information.

3. In denying motion to suppress evidence acquired and obtained as a result of a search of the defendant's home;

4. In denying motion for dismissal and objection to removal of jurisdiction and venue of this case to Yellowstone County, Montana, and for failure to file the alleged information in the court of proper jurisdiction and venue.

5. In denying defendant's objection to participation of the special prosecutor.

6. In its failure to sustain defendant's challenge to the jury panel.

7. In requiring defendant to impanel a jury without the entire panel being present or excused.

8. In denying defendant's challenge to juror Combs.

9. In denying defendant's motion objecting to the introduction of evidence.

10. In denying the defendant's motion to dismiss for total failure of proof.

11. In failing to advise the jury to acquit because the evidence in the case was insufficient to support a conviction.

12. In admitting into evidence State's exhibit 11.

13. In excluding the testimony of special prosecutor Berger as to his interest in the outcome of said prosecution.

14. In failing to grant defendant's motion for a mistrial.

15. In refusing to give defendant's proposed instruction No. 18, as offered.

We shall discuss these specifications as they are set forth in his brief by the defendant.

Turning to specifications 1 and 4, it is contended that the district court of Park County was without jurisdiction in this cause in that a former accusation against the defendant was removed to the district court of Meagher County, and that by reason thereof the Meagher County district court still retained jurisdiction. Defendant refers to Art. III, § 16, of the Constitution which provides for both the State and defendant obtaining a change of venue in a criminal action, and to section 94-6909, R.C.M.1947, which provides:

"*Trial.* The court to which the action is removed must proceed to trial and judgment therein as if the action had been commenced in such court. If it is necessary to have any of the original pleadings or other papers before such court, the court from which the action is removed must at any time, upon application of the county attorney or of the defendant, order such papers or pleadings to be transmitted by the clerk, a certified copy thereof being retained."

He then contends that when the district court of Park County granted the motion for change of venue such court lost jurisdiction to try any matter concerning the transaction, and that the proper venue and jurisdiction for filing a new information would be in the County of Meagher.

We cannot subscribe to the position of the defendant. Neither the Constitution nor section 94-6909, supra, provide for continuing jurisdiction over the defendant, and after an accusation

has been dismissed the constitutional provision, Art. III, § 16, clearly provides that the only court which has jurisdiction over a crime committed in a county is the court located in that county.

Specifications 2 and 9 deal with the demurrer to the amended information and objection to the introduction of evidence. The basis for this argument is that the information contains two offenses, burglary and larceny, and that it was not until July 1, 1961, when section 94-6407.1, R.C.M.1947, became effective that such practice was permitted; that the date of the commission of the alleged offenses was January 15, 1961, and that as to this date the statute is an ex post facto law, forbidden by our Constitution. To sustain this argument it would be necessary that section 94-6407.1 be substantive law rather than procedural law.

No ruling is required upon these two specifications for the reason that the information contained three counts and at the time of arraignment of the defendant a motion to strike count 3 was made by the county attorney and the motion was granted. Defendant entered a plea of not guilty to counts 1 and 2. When the case was called for trial on April 30, 1962, defendant moved to require the State to elect under which count they were going to prosecute the case, stating as a reason that the defendant should know before commencing his examination of the jurors. The State announced it would not resist the motion and did elect to prosecute upon the burglary count, being count No. 1, and the court thereupon dismissed count No. 2. The defendant then announced he was ready for trial.

While defendant asserts he was prejudiced thereby he made no such showing at the trial nor any request other than that the State make an election, the State promptly complied with his request and made the election. Defendant requested nothing further and announced he was ready for trial. We find no merit in either specificaton.

Specification 3 covers the denial of the motion to suppress evi-

430

dence obtained in the search of defendant's home. We will quote portions of the record commencing with the testimony of the Sheriff, Albert F. Nickelson:

"Q. Were you the Sheriff of Park County on February 15, 1961? A. I was.

"Q. On that date, Sheriff Nickelson, did you have occasion to go to the residence of the defendant, Keith Moran? A. I did.

"Q. And who, if anyone, was with you, Sheriff Nickelson? A. The County Attorney of Park County, Jack Shanstrom.

"Q. Now upon your arrival at the residence of the defendant what did you do, Sheriff Nickelson? A. Went to the door and rang the doorbell.

"Q. What if anything occurred? A. Mrs. Moran came to the door.

"Q. Now what did you do then, Sheriff Nickelson? A. I asked her if Keith was home.

"Q. And what occurred thereafter? A. Well, she stated that he was asleep.

"Q. And what did you then do? A. I requested that she tell him that I was there and that we had some business we wanted to discuss with him, get him up, words to that effect.

"Q. And where did you then go? A. I went back out to the car as I recollect.

"Q. And then when did you see the defendant? A. We waited in the car, Mr. Shanstrom and I waited in the car for a period of time and I went back to the house and inquired for Keith again and he was standing in the middle of the room.

"Q. Then what happened, Sheriff Nickelson? A. We went back out to the car.

"Q. Did the defendant accompany you then? A. Yes, I told him I had some business to discuss with him, I don't recall the exact words; we went back out to the car and talked at the car.

"Q. And what did you discuss, Sheriff Nickelson? A. I informed him of the purpose of my visit.

"Q. And what was that? A. I informed him that we were in possession of an Affidavit signed by Eddie Hencz, that certain automotive parts, articles might be in his possession, in his car or in his house or his garage.

"Q. Now did you show him that Affidavit, Sheriff Nickelson? A. I did.

"Q. Do you still have the original of that Affidavit? A. I do.

"Q. Do you have it with you? A. I do.

"Q. May I have it, please? * * *

"Q. Sheriff Nickelson, I hand you what has been marked for purposes of identification as Plaintiff's proposed Exhibit A, and I will ask you to examine it. Is that the original of the Affidavit which you had in your possession at the time to which you have testified? A. It is.

"Q. Was this Affidavit shown to the defendant, Keith Moran? A. It was.

"Q. Did he read it? A. I don't recollect whether I read it to him or whether he read it, it seems to me that he read it."

Plaintiff's Exhibit A reads as follows:

"STATE OF MONTANA⎱
                        ⎰ ss
"County of Park        ⎰

"I, EDWARD A. HENCZ, being first duly sworn, upon oath deposes and says:

"That I am a citizen of the United States of America, resident at Livingston, Montana, and over the age of 21 years.

"That on the 14th day of January, 1961, I was making my regular service call on the Highway Chevron Service Station. While I was inspecting the inventory of the part supply, the attendant asked me what some parts that were located on his work bench fit. This aroused my suspicions as they were all new parts, and if he had ordered them, I assumed that he knew what they fit. I therefore asked him where he got the parts, and he said that they came out of Keith Moran's car which was on

the grease rack at that time. I checked the parts that were on the bench and took the stock numbers off of each and every one of these items, which were as follows:

"I Standard Blue Streak Voltage Regulator, stock no. VR. 418X, value approximately $14.00;

"1 Standard Blue Streak Voltage Regulator, stock no. VR 424X, value approximately $14.00;

"1 Standard Blue Streak Voltage Regulator, stock no. VR 412X, value approximately $14.00;

"1 Raloc Generator, stock no. 5842, value approximately $22.00;

"1. Raloc Generator, stock no. 9205, value approximately $22.00;

"1 AC Fuel Pump stock no. 9468, value approximately $16.00.

"As soon as I checked the stock numbers on the above described parts, the attendant, in my presence, placed all of the above described parts back in Keith Moran's car.

"I then checked each of these items against our running inventory stock control and discovered that we were missing each of the above described items. I also observed one orange box with the stock numbers written on the outside of the box. I could identify the writing as the writing of our counter man, Ronnie Pool. We both are employed by the Montana Motor Supply, Livingston, Montana.

"After checking the stock numbers with the running stock inventory control, I went back to the Highway Chevron Service Station, and the attendant informed me that after he put the above described parts back into the Keith Moran auto, Keith picked the car up and left the premises, this was approximately 4:00 o'clock P.M.

"On February 7, 1961, a Marquette Acetylene Welding Super Jet outfit was missing from our window display. This was reported to the Livingston Police Department as stolen.

"There is probable cause for believing that said Keith Moran

has said stolen property in his possession either in his house or garage located on the premises commonly known as 317 South E Street, Livingston, Montana, or in his certain auto, described as 1951 Oldsmobile, bearing license plate no. 28-1102; and that said house, said garage and said automobile are the places to be searched.

"DATED this 15th day of February, 1961

"/s/   Edward A. Hencz

"SUBSCRIBED AND SWORN TO before me this........................
day of February, 1961.

"/s/   Jack D. Shanstrom

"Notary Public for the State of Montana
Residing at Livingston, Montana
My commission expires April 11, 1963"

"Q.   Now Sheriff Nickelson, was there then any discussion between you and the defendant or between the three of you in the defendant's presence concerning the issuance of a Search Warrant?   A.   There was.

"Q.   And what was that, please?   A.   I stated that we had this Affidavit on which to base a Search Warrant, I was reluctant to put the Affidavit on record for the public to see; I suggested to Jack Shanstrom before we left his office that we go and see Keith, see if we could resolve the matter satisfactorily without putting a Search Warrant on record, then if there was nothing to this we wouldn't have it there for the people to look at it.

"Q.   And then that was the nature of your discussion with the defendant at that time?   A.   That was the nature of it, yes.

"Q.   Now—  A.   That was part of it, we had other discussion there.

"Q.   Now did you ask him if you could search his premises?   A.   We did.

"Q.   And did he give you a direct answer at that time?   A.   No.

"Q. And what did he say to you? A. He wanted to go and see the fellow at the service station.

"Q. During the course of that entire conversation did the defendant ever refuse to permit you to search his house? A. He did not.

"Q. How long did you talk, Sheriff Nickelson, before you ultimately did search the premises? A. My recollection is that it was, must have been close to thirty minutes, half an hour, before we finally went into the house, I believe.

"Q. Now Sheriff Nickelson, during that period of time was there also some discussion about searching the car? A. The discussion about searching the car was after Mr. Moran said let's go down town and see the service station man.

"Q. Now Sheriff Nickelson, during the course of this discussion what if anything occurred with reference to your police radio? A. I would like to correct that last answer just a little if I may.

"Q. Go ahead. A. I think during our conversation I informed Keith that our purpose in being there, I mean Keith Moran, was that we wanted to look into his car, in his house, and in his garage and that that was the only thing that I would be satisfied with, the only thing that the County Attorney would be satisfied with, that we must look.

"Q. Now then, during the course of this conversation was there some business with the police radio or your radio? A. Yes, I think there was.

"Q. And what was that please? A. I don't know if I can give you exact words, I think I stated that if he was not going to permit us to search that I would call for some help and go obtain a Search Warrant.

"Q. And what was his response to that? A. He said, 'Let's go look.'

"Q. And what happened after that then, Sheriff Nickelson? A. After he agreed that we should go look I said, 'Let's start with your car.'"

The testimony of Jack D. Shanstrom, County Attorney of Park County, who accompanied the Sheriff, is to the same effect.

The defendant's version follows:

"Q. Would you state your name please? A. Keith Moran.

"Q. And are you the defendant in this action, State of Montana versus Keith L. Moran? A. Yes sir.

"Q. And do you recall something unusual happening at your house on or about the 15th day of February, 1961? A. Yes sir.

"Q. And to the best of your recollection at what time did this incident occur? A. Oh about 10:00 or 10:30 in the morning.

"Q. And would you state without going into a narrative what first happened that drew your attention to something unusual happening at your home? A. The sheriff had called at my house and he wanted permission to search the premises.

"Q. And when you say your house, is that the residence located at 317 South E Street, Livingston, Park County, Montana? A. Yes sir.

"Q. And who owns that house? A. At that time, I did.

"Q. And who resided there? A. I did.

"Q. And who else? A. My wife and family.

"Q. And when the Sheriff came to your house do you know if there was anyone with him? A. The County Attorney was outside.

"Q. And when you say the County Attorney do you mean Jack Shanstrom? A. Yes sir.

"Q. And he and the Sheriff both came to your house? A. Yes.

"Q. Now when they came to your house what if anything did you do? A. I had quite a long discussion with the Sheriff.

"Q. Did they tell you what they wanted? A. Yes.

"Q. And what did they tell you they wanted? A. They said they wanted to search my car, house, and garage for some auto parts.

436

"Q. Now when they told you they wanted to, did they just ask you if they could or did they make some other kind of conversation? A. Well they said they had this Affidavit to Search, and that if I wouldn't let them search that—if I made them get a Warrant they would see that I got a lot of bad publicity in the papers and over the radio.

"Q. Did you ask them if they had a Warrant? A. I don't know whether I did or not, they said they had an Affidavit to Search.

"Q. Did they tell you had made the Affidavit? A. Mr. Hencz.

"Q. Did they tell you what they were looking for? A. Some voltage regulators and generator, I remember.

"Q. At that time did you tell them they could search? A. No.

"Q. What, if anything, did you tell them? A. I told them I bought a generator and tail pipe from Murray Sutton, and I said, 'If you don't believe me just go up and talk to him.'

"Q. And how long did you and Mr. Shanstrom and Mr. Nickelson discuss this matter? A. Oh forty-five minutes to an hour.

"Q. And did you tell them if they wanted to search your house to go get a Warrant? A. I don't remember whether I stated it in that words, I told them I didn't see why I should let them search.

"Q. In any event, did you agree to let them search your house immediately? A. No.

"Q. Did you eventually agree to let them search your house? A. Well eventually I let them search.

"Q. After how long a period of time? A. Forty-five minutes to an hour.

"Q. And during that time did you discuss this matter with Mr. Shanstrom, the County Attorney? A. Yes.

"Q. You knew he was an attorney? A. Yes.

"Q. You knew he was the County Attorney? A. Yes * * *

"Q. Did you know he was an attorney? A. Yes.

"Q. Did you know what capacity he had? A. He was the County Attorney.

"Q. Had he previously advised you concerning legal matters? A. On occasion, yes.

"Q. And he had advised you on occasion concerning arrests and things in your capacity as Chief of Police, is that right? A. On occasion, yes.

"Q. Had you ever had any occasion to get advice from him in the City? A. Yes.

"Q. Had he, prior to being County Attorney, had he had any other position in the City? A. He was City Assistant Attorney.

"Q. And as City Assistant Attorney did he have any obligations in your capacity as Chief of Police? A. Yes, he advised me.

"Q. Well now going back to the day in question when you asked them to go down town, as you have testified, at that time had you agreed to let them search your house? A. No.

"Q. Did you eventually agree to let them search your house? A. Yes.

"Q. And prior to that time did they make any promises, threats, or in any way intimidate you concerning the search of your house? A. Yes, they did.

"Q. And would you tell the Court exactly what they did? A. I wouldn't let them search without a Warrant, and they said that if I forced them to get a Warrant, they said, 'You know you have got some enemies on the City Council now and if we have to get this Warrant you are going to get a lot of bad publicity in the press and radio, and you are probably going to get in a lot of hot water,' and they said, 'if you let us search without the Warrant we will keep it quiet and nothing will happen.'

"Q. And at that time they told you they were looking for some auto parts, is that correct? A. Yes.

"Q. And when they came into your house did they find any auto parts? A. No sir.

"Q. After they had made the search concerning the auto parts did Mr. Shanstrom or Mr. Nickelson make any statements to you concerning the auto parts? A. Mr. Nickelson did.

"Q. And what was said? A. He told me he knew I didn't have the auto parts.

"Q. And at that time when they were making a search that you have testified to, is that the time they picked up the office machinery or office equipment that is concerned in this Information? A. Yes sir.

"Q. And at that time when they took the office equipment from your house did they state any reason for taking it? A. The Sheriff did.

"Q. And what was his reason? A. He said that he was working with the F.B.I. on the case, that it was a Federal case and that he was going to call Mason Melvin, that it was a Federal case, they would have to take the machines.

"Q. And was Mr. Shanstrom present? A. I don't know, I think he was, I am not sure.

"Q. Was there anyone at your house during the search and seizure besides—will you tell us who was at your house during the search and seizure? A. Well my wife was present.

"Q. And who else? A. Albert Nickelson and the County Attorney part of the time.

"Q. And who else? A. And—

"Q. Were you there? A. I was there, yes.

"Q. Were your children there? A. I think one of them was.

"Q. Was there anyone else there? A. No sir."

Under cross-examination defendant testified:

"Q. Mr. Moran, at the time you attribute the statement

of the bad publicity to one or the other of the parties, is it not true that they advised you that that would be the result of filing of Hencz's Affidavit? A. I don't remember the exact words other than they said if they had to go get the Warrant that I was going to get a lot of bad publicity through the radio and press.

"Q. And that was a statement of fact that they had made, isn't that right? A. That's what they said.

"Q. And did they threaten to see that you got the bad publicity? A. That's the way I took it.

"Q. But that isn't what they said, is it? A. That's what the County Attorney inferred.

"Q. It was an inference rather than what he said, is that correct? A. Both, yes, inference from his statement, yes.

"Q. They did show you the Affidavit of Eddie Hencz, is that right? A. Yes.

"Q. And did they also advise you that in their opinion the Affidavit was sufficient upon which a Search Warrant could be based? A. I am not sure of the words, they said they could get a Search Warrant.

"Q. On the basis of the Affidavit or did they mention that? A. I am not sure.

"Q. Mr. Moran, as former Chief of Police of Livingston, have you ever obtained a Search Warrant before? A. I never have, no.

"Q. Are you familiar with what the procedure is? A. Well I had never obtained one, just what information I had been told by people.

"Q. Well did you know that the procedure for a Search Warrant was the filing of an Affidavit before the Court and the Court's issuance of a Search Warrant? A. At that time I don't know whether I did or not. I do now.

"Q. And that then it became a matter of public record as any case filed before the court does? A. I don't know.

"Q. You don't know that now? A. I didn't know it then, no.

"Q. Well isn't it a fact, as a matter of fact that that is what you were told then, Mr. Moran? A. I was just told that I would get a lot of bad publicity if I wouldn't let them search without a Warrant and that I would get in more trouble with the Aldermen than I was already in trouble with.

"Q. And on the basis of that you did agree to let them search? A. Finally, I tried to get them to go up and do a little checking on this first but they refused to do so.

"Q. Well your statement to Mr. Hennessey in response to the question, did you eventually agree to let them search your house, is yes yes that is correct, isn't it? A. Yes.

"Q. Mr. Moran, after Mr. Shanstrom and Mr. Nickelson got into the house did you take them directly to the room and closet that contained the Downer property? A. Well that was in the first room, the living room is the first room and that's where we started.

"Q. Did you ask them where they wanted to start to look? A. No, they searched the car first, Mr. Shanstrom didn't come into the house on the search.

"Q. Did you go get the key to the automobile for the Sheriff to use in his search? A. I believe I had to get a key, yes.

"Q. And did you open the car for him then? A. Yes.

"Q. And when you got to the house did you precede the Sheriff into the house? A. He and I went in together.

"Q. And do you recall the Sheriff making a statement to you, 'Keith, we don't want to tear your house up, do you want to show us around?' A. I believe he did.

"Q. And then in response of that statement of his did you show him around? A. Yes.

"Q. At least as far as the Downer property was concerned? A. That's right, that far and then out to the garage also."

■■ While we have not set forth all the testimony at this hearing, the foregoing appears to be sufficient to show

that defendant consented to the search. Defendant at the time of this hearing had been on the police force about thirteen years, had been Chief of Police a little over four years. He was a trained officer of the law, familiar with the rights of those charged with committing crime, and it ill behooves him to contend here that he was coerced into permitting the search. He was persuaded, that is apparent from the record, and stated: "Let's go look." We see nothing in this record that indicates the county attorney or sheriff did anything but what they had a legal right to do.

The district court was correct in denying the motion to suppress the evidence.

Specifications 5 and 13 contend that it was error to permit the appointment of a special prosecutor and also to limit the scope of his examination of such special prosecutor.

At the commencement of the trial, defendant's counsel objected to the participation of the special prosecutor on the ground that there was no statutory authority for a county of the first class to retain a special prosecutor, and on the further ground that he had been informed and believed that the special prosecutor was retained by people in Livingston, Montana, who have a special interest in obtaining a conviction, and that permitting such participation would be to allow one having a financial interest in the outcome of a criminal case to prosecute.

The county attorney then advised the court that under the provisions of section 16-2409, R.C.M.1947, he had appointed Mr. Berger, the special prosecutor referred to, as a special deputy without compensation and that Berger had taken an oath of office under that appointment.

The objection was then renewed on the ground that the statute expressly forbids a public official from receiving remuneration other than as provided by law for any duties that he performs. A recess was then taken by the court and the matter discussed outside the presence of the jury. No record

is before us of this discussion but when the court again convened the objection was denied.

During the trial defendant called Mr. Berger as a witness and during the course of his examination propounded these questions:

"Q. And you have appeared in this case as special counsel for the State of Montana? A. Yes.

"Q. Are you being paid any money? A. Yes.

"Q. And who is paying you, if anyone?"

Objection was made that the question was incompetent, irrelevant and immaterial. Following colloquy a recess was taken and the matter was argued in chambers outside the presence of the jury. The court requested counsel to submit authority. At that time defendant's counsel stated:

"MR. HENNESSEY: Well your Honor, at this time I state to the Court that I am unable to find the express citation but the case has been cited and it does not directly hold that you cannot hire, it holds and there was a recent civil case that held and cited with authority as the implied rule that no one can have a financial interest in the outcome of a criminal case and sit as prosecutor and it is my contention that that is the law in the State of Montana and we feel that at this time for the Court to refuse to require Mr. Berger to state who is hiring and who is paying him is contrary to the authority cited by the State for their position and I am not going to make any further argument on it."

Mr. Berger stated:

"I would just assume that the words 'having a financial interest in the outcome' would imply either some contingent agreement or something of that nature, and I can't see where —there is certainly no evidence of that and as a matter of fact of course it is not true."

The Court then observed:

"Well the fact that an attorney is being paid for his services does not automatically make him a party in interest in a

lawsuit who has a financial interest in the prosecution, he is merely being paid for his services as an attorney, just as attorneys are paid in all proceedings. Well there having been no authority cited in support of the defendant's position, and the only authority which has been discovered by counsel during the recess called for the consideration of this objection being 42 Am.Jur. at 243, which authority is contrary to the position of the defendant, the Court will now rule as soon as we return to the courtroom.''

Upon reconvening of the court, the objection was sustained.

In State ex rel. Porter v. District Court, 124 Mont. 249, 271, 220 P.2d 1035, 1046, reference was made to the employment of special prosecutors in these words.

"This court too has sustained the right to appoint a special prosecutor to assist the county attorney in the *trial* of a criminal action. State v. Whitworth, 26 Mont. 107, 66 P. 748. Tull v. State ex rel. Glessner [99 Ind. 238] was cited in support of this position. See also, State v. Tighe, 27 Mont. 327, 71 P. 3. Since 1909 there has been express statutory authorization for the employment of 'special counsel to assist in the prosecution of any *criminal case pending*.' R.C.M.1947, § 16-1126; Board of Comm'rs of Hinsdale County v. Crump, 18 Colo.App. 59, 70 P. 159, and People v. Blackwell, 27 Cal. 65, 66, cited by *amici curiae* were cases of this kind where the special counsel was appointed to assist in the conduct of the trial.''

In State v. Cockrell, 131 Mont. 254, 260, 309 P.2d 316, 319, this court stated:

'' * * * Likewise without any order of the board of county commissioners, the county attorney may appoint as many deputies as necessary for the faithful and prompt discharge of the duties of his office, providing that no compensation or salary may be allowed therefor. R.C.M.1947, § 16-2409. See State v. Crouch, 70 Mont. 551, 227 P. 818, where this court

sustained the right of the county attorney to appoint a deputy to act without pay."

Continuing further in that opinion:

"Likewise the rule is that even though there was no order of appointment of the special prosecutor, the defendant is in no position to complain so long as he had a fair and impartial trial and so long as the special prosecutor is not guilty of conduct prejudicial to defendant. State v. O'Brien, 35 Mont. 482, 90 P. 514; State v. Briggs, 45 Mont. 400, 123 P. 410."

A careful review of the record here does not indicate that any conduct of Mr. Berger was prejudicial to the defendant, and it appears that he was at all times fair and proper during the trial.

While defendant's counsel insists that the county attorney misrepresented the situation with respect to Mr. Berger before the jury when he stated he had appointed him his special deputy, this appears to have been exactly what had been done. The only reason the matter was ever before the jury was the result of defendant's actions in objecting to his participation on the trial of the case. Counsel stated in his first motion that he was informed and believed Berger was hired by people at Livingston. The fact that counsel appearing to assist a county attorney upon the trial of an action receives compensation from independent sources does not make him a party in interest so it could be charged that he has a financial interest in the prosecution. It can hardly be contended that prejudicial error can result when counsel makes a statement before the court which prompts a reply as to the facts by opposing counsel, as was the case here. In our view, the court's ruling was correct.

Specifications 6 and 7 deal with the challenge to the jury panel and requiring defendant to impanel a jury without the entire panel being present or excused.

The trial was originally set for April 9, 1962, and postponed until April 30, 1962, and members of the jury panel were ad-

vised by the authorities by phone or in person of the post-ponement. When the case came on for trial it appeared that two jurors who had not been excused were absent from roll call. The court directed the sheriff to check on them and make a report and stated to counsel that they would proceed in the meantime. Defendant then challenged the panel on the grounds "that it affirmatively appears from the record that undoubt-edly there was been great confusion, and there is some ques-tion in the mind of the defendant and his counsel as to the service, and there appears to be some duplicity in the assess-ment rolls of Yellowstone County, and at this time we would require the State to prove that the panel was duly and prop-erly empaneled in form and we use as our basis of that the case of State ex rel. Henningsen v. Silver Bow County, and the criminal case based on it that reversed a conviction when I was County Attorney."

The following colloquy was had between court and counsel.

"THE COURT: You wish to present evidence on that, Mr. Hennessey? You have the affirmative, you are making the challenge.

"MR. HENNESSEY: Yes, Your Honor, I believe I will stand on the record as made in this courtroom this morning as appears in the official record of the court reporter.

"MR. BERGER: Your Honor, the challenge is resisted and we feel that if the defendant is electing to stand on the show-ing that has been made in the courtroom alone then we be-lieve there has been an insufficient showing and I believe that it is not entitled to the Court's consideration.

"MR. HENNESSEY: In that connection, may I call the Court's attention to the fact that various officers of the Court have testified that they didn't know whether certain people were served, they testified that certain people were called on the telephone, they also testified that certain peoples' phones were out of order, and we reiterate our position and we feel that without a full jury panel it violates the defendant's

446

guarantee to a free and fair trial and violates the due process of law clause.

"THE COURT: Well, this jury was originally summoned to appear on the 9th day of April, 1962, is that correct; is it not, gentlemen?

"MR. SPEARE: Yes, Your Honor.

"MR. HENNESSEY: Yes, Sir.

"THE COURT: And the reference to telephone calls is not with respect to the original service of jury summons upon members of the panel, but relates to the notification of the postponement of this case from April 9, 1962, to April 30, 1962. Since no showing has been made that the jury was not selected, drawn or summoned in the manner prescribed by law, the challenge to the panel is denied.

"MR. HENNESSEY: And may the record show that the defendant excepts to the impaneling of the jury without the entire jury as served or excused being present for the drawing.

"THE COURT: And it will be shown that there are two absent."

Defendant cites as authority for his position the case of State v. Groom, 49 Mont. 354, 359, 141 P. 858, wherein this court stated:

"* * * The right to challenge the jury panel for the intentional omission of the sheriff to serve one or more of the jurors drawn is but a legislative amplification of the constitutional guaranty that in every criminal prosecution the accused shall have the right to 'a speedy, public trial by an impartial jury.' If the sheriff may be permitted to summon only such veniremen as suits his whim or caprice, he can pack the jury in any given case as effectively as though the selection of the entire jury were left exclusively to him."

Defendant refers to the case of State ex rel. Henningsen v. District Court, 136 Mont. 354, 348 P.2d 143, as further authority for his position, but clearly there is no showing here

of material deviation or departure from the statutory procedure for the impaneling of a jury as existed in that case.

The record does not show that the panel had not been served. It is presumed that official duty has been performed and the burden is on the defendant to affirmatively show error. 50 C.J.S. Juries § 197(d), page 930, states:

"The fact that not all of a full panel summoned are present will not necessarily delay selection of a jury or afford ground for challenge to the array."

■ Therefore, the fact that two of the jurors were not present or excused when the jury was impaneled does not constitute error. Nor does this case come within the facts in the case of State v. Groom, supra, as in that case the record disclosed that certain members of the panel had not been served by the sheriff. Section 94-7105, R.C.M.1947, provides the sole grounds for a challenge to the panel as follows:

"A challenge to the panel can be founded only on a material departure from law in respect to the drawing and return of the jury as in civil actions, or on the intentional omission of the sheriff to summon one or more of the jurors drawn."

■ The failure of a juror to appear, if properly notified, will not invalidate the subsequent trial, as the defendant has no right to any particular juror, his right is to reject jurors. In the case of State v. Huffman (1931), 89 Mont. 194, 198, 296 P. 789, the court said:

"The right to challenge is the right to reject, not to select, a juror; no person can acquire a vested right to have any particular member of a panel sit upon his case unless and until such member has been accepted and sworn. Prejudice is not presumed from error, and we are commanded by section 12125, Revised Codes 1921, [ now R.C.M.1947, § 94-8207] to 'give judgment without regard to technical errors * * * which do not affect the substantial rights of the parties.' This has been the rule in this jurisdiction since territorial days. [Citing cases.]"

The record further discloses that while the examination of the jurors was in progress a report was received as to the two missing jurors. One had moved to Seattle and was no longer a resident of Yellowstone County. The other was living in Missoula and had never been served.

We find no prejudicial error in the rulings of the court.

Specification 8 covers the denial of defendant's challenge to the prospective juror Combs.

This juror on his voir dire examination stated that he had heard about the case on the radio, television, and newspapers, followed it quite closely, and had an opinion. Following a challenge for cause the court inquired if the opinion was based on newspaper reports only, and the juror stated it was from newspapers, radio and television. He had not discussed the case with people who might have had something to do with it, his information came solely from public media. The court further asked him if he could lay aside what he may have read or heard previously concerning the case and judge it solely upon the evidence introduced upon the trial and Combs replied:

"Well, I would have to." The court further asked:

"Or do you have such a fixed opinion resting upon your mind that evidence would not remove it? A. No, I don't think that is the case.

"Q. Has any person who purported to know any of the facts about this case discussed it with you? A. No, sir.

"Q. And this opinion or impression that you say you have is based solely upon what you have heard or read in news media? A. That is right." The court then denied the challenge.

Further examination was had and the challenge was repeated several times. At one point the court stated:

"The challenge is denied because of the provisions of Section 94-7122 which provides that no person shall be disqualified as a juror by reason of having formed or expressed an

opinion upon the matter or cause to be submitted to the jury, founded upon public rumor, statements in public journals, or common notoriety, provided it appears to the Court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him."

The statute (R.C.M.1947, § 94-7122) referred to by the court provides:

"In a challenge for implied bias, one or more of the causes stated in section 94-7120 must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of section 94-7119 must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, or common notoriety, provided it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered in the minutes of the court or of the stenographer."

It is obvious from a careful reading of the examinations of this juror that he had an opinion gained from what he had heard on television and radio and read in the newspapers, but he also stated that he could try the case solely upon the evidence produced in the court room and disregard anything he had heard or read outside.

In State v. Russell, 73 Mont. 240, 235 P. 712, this court held that the trial court was the judge of the weight to be given to the testimony introduced on voir dire examination, and if the trial court had any doubt as to the existence of such a state of mind as would disqualify a juror that it should sustain a challenge in the interests of justice.

The holdings in State v. Byrne, 60 Mont. 317, 199 P. 262, and State v. Vettere, 76 Mont. 574, 248 P. 179, were to the

effect that the forming of an opinion or impression should not disqualify a juror if under oath he states that he can fairly and impartially render a verdict in accordance with the law and the evidence, and the court is satisfied that such statement is true.

Section 94-7122, supra, was enacted in 1895 and has been held to be constitutional many times. Sixty years ago, in referring to this section in State v. Mott, 29 Mont. 292, 74 P. 728, this court stated:

"This section was passed in view of conditions which now obtain. The wide publicity given cases of a criminal nature by the newspapers leads to much idle and desultory public and private discussion. The people talk of the alleged crime and form opinions thereon, contemplating that the reports current may not be based upon a true state of facts. The opinions thus formed are usually indefinite and not deeply impressed upon the mind. Men in general are willing to set aside such lightly formed opinions, and to rationally decide upon the evidence adduced by the solemn processes of the law. Any other rule than that expressed in the statute would seriously hinder the courts in the disposition of criminal business."

News media today is far more extensive than it was in 1903 in that we now have the radio and television which broadcasts information with respect to matters of public interest. We have consistently held that the trial judge is the judge of the weight to be given to the testimony on voir dire. In the instant case he was extremely liberal with counsel in permitting them to pursue their examination to great length. Constant and repeated interrogation becomes confusing and embarrassing to prospective jurors, particularly when they would like to be excused from service. This juror had not discussed the case with anyone purporting to know any of the facts in the case and the trial judge was satisfied that he could fairly and impartially serve, and it is our opinion that he did not abuse his discretion in so holding.

We should comment further that the prospective juror Combs did not sit as a trial juror in this cause and the specification is directed solely to the contended abuse of discretion on the part of the trial court.

Specifications 10 and 11 cover the denial of the motion to dismiss and refusal to advise the jury to acquit. The main question presented is whether the evidence contains independent facts and circumstances sufficient to corroborate the testimony of the accomplices to sustain the verdict of the jury and judgment of the court.

It would unduly lengthen this opinion to set forth the evidence appearing in this record, suffice it to say that in our opinion the State offered evidence to show that a burglary had been committed; that the defendant was in possession of some of the property stolen; that his accomplice was likewise in possession of some of the property stolen; that defendant's explanation of such possession was questionable.

Section 94-7220, R.C.M.1947, provides:

"A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

We have interpreted this statute many times, and in State v. Harmon, 135 Mont. 227, 237-238, 340 P.2d 128, we reviewed such interpretations at length. It is not necessary to repeat this review here, but in concluding this court stated:

"The rule on corroboration is well put by Mr. Justice Holloway in State v. Cobb, 76 Mont. 89, at page 92, 245 P. 265, at page 266, where he says:

" '(a) The corroborating evidence may be supplied by the defendant or his witnesses.

" ' (b)   It need not be direct evidence—it may be circumstantial.

" ' (c)   It need not extend to every fact to which the accomplice testifies.

" ' (d)   It need not be sufficient to justify a conviction or to establish a *prima facie* case of guilt.

" ' (e)   It need not be sufficient to connect the defendant with the commission of the crime; it is sufficient if it tends to do so.

" ' (f)   Whether the corroborating evidence tends to connect the defendant with the commission of the offense is a question of law, but the weight of the evidence—its efficacy to fortify the testimony of the accomplice and render his story trustworthy—is a matter for the consideration of the jury.' State v. Cobb, supra, has often been followed by this court. See State v. Yegen, [86 Mont. 251, 283 P. 210] supra; State v. Jackson, 88 Mont. 420, 430, 293 P. 309, 311; State v. McComas, supra [85 Mont. 428, 278 P. 993]; State v. Donges, [123 Mont. 341, 251 P.2d 341] supra; State v. Duran, 127 Mont. 233, 236, 259 P.2d 1051, 1052; State v. Phillips, 127 Mont. 381, 387, 264 P.2d 1009, 1012; State v. Slothower, 56 Mont. 230, 182 P. 270; State v. Ritz, [65 Mont. 180, 211 P. 298] supra; State v. Keckonen, 107 Mont. 253, 84 P.2d 341; State v. Jones, [95 Mont. 317, 26 P.2d 341] supra.

"State v. Cobb, supra, has clearly established the formula by which the facts are judged. Each case rests on its own facts with the above formula applied to those facts. The corroborating evidence need not be sufficient to justify a conviction or even to establish a *prima facie* case of guilt. The corroborative evidence here raises more than suspicion; it is inconsistent with defendant's constitutional presumption of innocence; and it identifies the accused as the criminal the accomplice says he is. Jones on Evidence (5th ed.), § 814, p. 1526. It *tends to connect*."

After a thorough and searching review of the evidence pre-

sented in this case, it is our opinion that the testimony of the accomplice was corroborated and that the rulings of the district court were correct.

Defendant under these specifications makes one other contention, and that is that there is a total failure of proof that the burglary was committed in the nighttime as defined in section 94-905, R.C.M.1947, which reads:

"The phrase 'nighttime,' as used in this chapter, means the period between sunset and sunrise."

Thomas Charles Adams testified:

"Q. And approximately what time of day did you meet? A. I couldn't really place the time, 6:30, 7:00, it was after dark.

"Q. It was dark? A. Yes."

Defendant contends that it was incumbent upon the State to prove the time of sunset. Much the same argument was made to this court in State v. Board, 135 Mont. 139, 337 P.2d 924, and after setting forth portions of the testimony in that case this court stated:

"The evidence here clearly comes within the requirement set out in State v. Fitzpatrick, 125 Mont. 448, 239 P.2d 529, 531. There, in the words of Justice Freebourn, the record showed no 'substantial evidence to prove when the burglary occurred, and there was a total failure on the part of the state to prove such burglary was committed in the nighttime.' The exact contrary exists here."

The same situation exists here, the witness testified it was "after dark" and this stands undisputed in the record.

We should make further comment as to these specifications. No motion for a new trial was made in this case and questions involving the sufficiency of the evidence to justify the verdict are reviewable only from an order denying a new trial. See State v. Gransberry, 140 Mont. 70, 367 P.2d 766. However, since a transcript on appeal was filed herein with-

454

out objection we have considered the sufficiency of the evidence.

Specification 12 contends error in admitting State's Exhibit 11, a list of office machines allegedly owned by the Downer Lumber Company. The exhibit was offered as to only those items to which the evidence had referred which were relevant in the case. Counsel for the defendant objected on the ground there was no proper foundation and contended that if it was admitted the whole exhibit must go in. The court reserved ruling.

After the State rested, outside the presence of the jury, defendant moved to strike all evidence concerning serial numbers and the office machines as being based on a document not introduced in evidence, being Exhibit 11. The court observed that it had not yet ruled on the objection to the introduction of the exhibit and then overruled the objection and denied the motion. The record contains this bracketed statement:

"(Be it remembered that State's Exhibit No. 11 was not read or handed to the jury, and the jury did not have knowledge of the contents of Exhibit 11 by physical contact with this exhibit.)"

It appears with respect to those items covered by the exhibit which were relevant that a sufficient foundation had been laid. The court very properly did not permit the exhibit to be read to, or go to the jury because of the limited portion thereof which was offered and received. We fail to see where the defendant was materially injured in his defense as contended since this is a burglary prosecution, not one for larceny. There was no prejudicial error.

Specification 14 covers the motion for mistrial. The situation here is that on the afternoon prior to argument, while settlement of instructions was in progress, the county attorney filed a charge against one Bogue for embracery involv-

ing a juror sitting in this case. These facts were noted by the city newspapers, radio and television.

The record shows that defendant rested his defense and the court stated:

"It is now 10:30 o'clock A.M. and we will recess until 10:45, and I will again admonish the jury as I have heretofore, that you are not to discuss this case among yourselves and that you are not to permit anyone else to discuss it with you, and that you are not to form or express any opinion as to the merits of this case until it is finally submitted to you."

The State immediately following the admonition likewise rested. Following a discussion between court and counsel as to the time necessary for settlement of instructions the court stated:

"Well I have just admonished the jury so it will not be necessary to do that again. The members of the jury are admonished further not to read any newspaper accounts before tomorrow morning, not to listen to any news broadcasts on the radio or on television. With those admonitions, you will be excused until tomorrow morning at 9:30 o'clock. We will begin settling instructions at 1:00 this afternoon then."

The following morning when court convened the jury was excused and in their absence defendant moved for a mistrial in the following language:

"At this time the Defendant offers in evidence defendant's Exhibits C and D, which are newspapers published by the Billings Gazette dated Thursday evening, May 3rd, and Friday morning, May 4, 1962, wherein there are headlines which allege that there has been some tampering done with the Jury in this case, and which contain an inference that it might have been done on behalf of the Defendant, and at this time we move the Court for a mistrial on the grounds and for the reason that the filing of this charge by the counsel for the State of Montana at this crucial time, when the case is about

to go to the Jury, is misconduct on the part of the State, and it deprives the Defendant of a fair and impartial trial."

No objection was made to the introduction of the defendant's exhibits and they were received. The motion was resisted by the State. The jury were returned into court and the court addressed the jury:

"Ladies and gentlemen of the Jury, at the time you were excused yesterday I specifically directed the members of the jury not to read any newspaper, and not to listen to any radio or television news broadcasts. Counsel for both the Defendant and the State have, like I have, full confidence in all of the members of this Jury, and I have no reason to believe that any of you would violate the specific orders of the Court by reading any newspaper or listening to any news broadcast. Nevertheless, as a matter of precaution, I am going to ask whether or not any of you have violated the orders of the Court. I will now ask whether or not, since the adjournment of Court yesterday, any of you have read any newspaper or listened to any news broadcast of any kind? If any of you have done so, will you please raise your hand?"

The record states that the court waited a full minute for a response from the jurors. No hands were raised. Then the court stated:

"Since it appears that no member of the Jury has read any newspaper or listened to any news broadcast, and that as conscientious jurors you have obeyed and carried out the specific instructions of the Court, the Motion of the Defendant made in chambers will be denied."

The court gave the following instruction to the jury:

"Instruction No. 39. The Court instructed the jury that in their consideration of this case they will only consider the evidence of the witnesses upon the witness stand and such documentary evidence as has been by the Court admitted in evidence; and they are further instructed that it is their duty to in nowise consider or regard any remarks of counsel in

this case which are not supported by evidence as given by the witnesses on the witness stand, and no juror shall allow himself to be influenced in any degree by any news report of any kind or by anything which he may have seen or may have heard or read in any book, paper or pamphlet, or other written or printed matter which may have been seen or read by him, outside of the evidence and exhibits in this case.''

In this situation defendant argues that the county attorney should have known that wide-spread publicity would have followed the filing of the complaint against Bogue, and that such conduct deprived the defendant of a fair and impartial trial.

Defendant makes no showing that any juror read the articles in the newspapers or heard any reports over radio or television or disregarded the court's admonitions and instructions. We cannot assume that such was the case. Situations of this type rest in the sound discretion of the court, and it appears here that the court took every precaution available and exercised such discretion and believed that the rights of the defendant had been adequately protected. From the showing made here we cannot say that his discretion was abused.

Specification 15 covers the refusal of the court to give defendant's proposed instruction 18 and amending it by striking out the first paragraph which read:

''You are instructed that if the evidence in this case in its weight and effect be such as that two conclusions can be reasonably drawn from it, the one pointing to the defendant's innocence, and the other pointing to his guilt, the law demands that the jury adopt the former and find the defendant not guilty.''

The court did give the usual instructions as to defendant's presumption of innocence; that the burden of proof was on the State and must be proved beyond a reasonable doubt. It then followed with this instruction:

''You are instructed that in this case the law raises no pre-

sumption against the defendant, but every presumption of law is in favor of his innocence; and in order to convict the defendant of the crime alleged in the information, every material element necessary to constitute such crime must be proved beyond a reasonable doubt or to a moral certainty; and if the jury entertain a reasonable doubt upon any element necessary to constitute the crime, it is their duty to give the defendant the benefit of such doubt and acquit him."

In our view the jury were adequately instructed so as to protect defendant's constitutional rights. Restatements in different language of the same legal principle need not be given and our comment in State v. Bain, 130 Mont. 90, 98, 295 P.2d 241, is applicable here:

"The defendant's offer upon the same issues was at best a restatement of the charge already given in slightly different language. Under any construction it was plainly repetitious, and upon this ground was rightly refused. State v. Park, 88 Mont. 21, 33, 34, 289 P. 1037; 23 C.J.S., Criminal Law, § 1304, pp. 889-891; 16 C.J., Criminal Law, § 2475, pp. 1035, 1036; 53 Am.Jur. Trial, § 559, p. 444."

In summary, defendant charges that his rights have been consistently violated and that the record is replete with error. We have carefully reviewed his contentions but in our opinion the evidence justified the verdict returned by the jury. These legal proceedings were lengthy and at all times hotly contested. Defendant was represented by experienced counsel who ably protected his rights at every turn and here, as in every case, there were some irregularities but irregularities must be shown to have been prejudicial.

In our view no prejudicial error has been shown from the record on this appeal and the judgment is accordingly affirmed.

MR. JUSTICES CASTLES, JOHN C. HARRISON, ADAIR and DOYLE, concur.